IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

| | | |
|---|---|---|
| ROCKSTIM CONSULTING, LLC, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| WORKRISE TECHNOLOGIES, LLC, | § | CIVIL ACTION NO. _____ |
| RUSCO OPERATING, LLC, | § | |
| SM ENERGY COMPANY, SDS | § | |
| PETROLEUM CONSULTANTS, LLC, | § | |
| PRECISION PETROLEUM | § | |
| SOLUTIONS, LLC, NATHAN MOORE, | § | |
| JAMES DAVID RAPPATTONI, and | § | |
| GENO HILL | § | |
| Defendants. | § | |

## COMPLAINT

Plaintiff Rockstim Consulting, LLC ("Plaintiff") files this Complaint against the named defendants and respectfully alleges as follows:

### I.   PARTIES

1. Plaintiff Rockstim Consulting, LLC is a Texas limited liability company with its principal office in Austin, Travis County, Texas.

2. Defendant Workrise Technologies, LLC a/ka/ RigUp, Inc. ("Workrise Technologies") is a limited liability company with its headquarters and principal offices in Travis County, Texas, at 111 Congress Ave, Ste. 1300, Austin, Texas 78701, and who may be served by serving its registered agent Corporation Service Company, at 211 E. 7th St., Ste. 620, Austin, Texas 78701.

3. Defendant Rusco Operating, LLC ("Rusco" and collectively with Workrise Technologies, "Workrise") is a limited liability company with its headquarters and principal offices in Travis County, Texas, at 111 Congress Ave, Ste. 1300, Austin, Texas 78701, and who may be

1

served by serving its registered agent Corporation Service Company, at 211 E. 7th St., Ste. 620, Austin, Texas 78701.

4. Defendant SM Energy Company ("SM") is a Delaware corporation doing business in Texas. SM may be served with process through its registered agent, Corporation Service Company, at 211 E. 7th St., Ste. 620, Austin, Texas 78701.

5. Defendant SDS Petroleum Consultants, LLC ("SDS") is a Texas limited liability company, and that may be served through its registered agent, Scott D. Stovall, at 1406 Rice Rd, Ste. 400, Tyler, Texas 75703.

6. Defendant Precision Petroleum Solutions, LLC ("PPS") is a Texas limited liability company with its primary place of business in Texas. PPS may be served through its registered agent, Bethany Credeur, at 621 Rollingbrook Dr., Baytown, Texas 77521.

7. Nathan Moore ("Moore") is an individual who may be served at his residence located at 7102 E County Rd 112, Midland, Texas 79706-3899.

8. James David Rappattoni ("Rappattoni") is an individual who may be served at his residence located at 164 Pine Crest Circle, Montgomery, Texas 77316, or his place of business, 1308 Milltown Rd., Midland, Texas 79705.

9. Geno Hill ("Hill") is an individual who may be served at his residence located at 631 Aster Trail, San Antonio, Texas 78256.

10. Each of the foregoing may be served at the address(es) provided, or wherever they may be found.

II. **JURISDICTION AND VENUE**

11. Subject matter jurisdiction of this Court is predicated upon federal question jurisdiction, 28 U.S.C. §§ 1331, and the original jurisdiction granted under 28 U.S.C. §§ 1337(a),

and further jurisdiction is based on exclusive jurisdiction set forth in 15 U.S.C. § 15(a) and non-exclusive jurisdiction set forth in 18 U.S.C. §§ 1836, et seq. The Court has supplemental jurisdiction under 28 U.S.C. §§ 1367(a) over the other claims and parties because the claims are so related to the federal question claims that they form part of the same case or controversy and stem from the same nucleus of facts on which the federal claims are based.

12. Personal jurisdiction is proper because the causes of action asserted herein arise from business done in this State and because Defendants are residents/citizens of Texas and/or regularly engage in business in Texas.

13. Venue is proper for this Court pursuant to 28 U.S.C. §1391(b)(1)&(2) because one or more of Defendant's principal office is located in this district; because a substantial part of the events described herein occurred in this district; and/or because each Defendant is subject to the Court's personal jurisdiction with respect to this action.

### III.   FACTS

14. Plaintiff provides skilled engineering consulting and quality control services to clients in the oil and gas industry. Plaintiff entered a Master Work Agreement ("MWA") with Defendant SM on or about December 23, 2016, and Plaintiff provided services to SM through Plaintiff's employees and contractors, pursuant to that MWA, from that date until Defendants destroyed Plaintiff's competitive business.

15. Like Rockstim, Defendants SDS, Workrise, and PPS operate in skilled engineering consulting and quality control services market in the oil and gas industry. Workrise is the largest consulting firm in the United States and offers its services nationwide, SDS is nearly the largest and also offers its services nationwide, and PPS has a substantial presence in Texas. SM is a publicly-traded oil and gas company that contracts with such consulting companies to provide its

3

services throughout Texas and the United States. Hill worked for SDS during the relevant periods and served as an SDS contractor with SM. Rappatoni worked for Workrise during the relevant period and served as Workrise contractor with SM. Nathan Moore was an SDS contractor until November 2022, when he joined SM as an employee. Rockstim competed with SDS, Workrise, and PPS in Texas, but the oil and gas produced as part of Plaintiff's and Defendants' work is exported throughout the United States and the world.

16. Unbeknownst to Plaintiff at the time, in or about August 2023, Rockstim's competitors, Workrise (by way of Rappattoni) and SDS (by way of Hill) (collectively, the "Contract Superintendents"), conspired with SM, to put the Contract Superintendents in charge of approving their competitor-Plaintiff's invoices. Immediately after these Contract Superintendents were put in place, SM stopped timely paying Plaintiff's invoices, in breach of the Master Work Agreement and SM protocols. Once the Contract Superintendents were put in place, Plaintiff had more overdue invoices owed by SM in the subsequent three months than it had experienced in the preceding 6.5 years, with approximately $250,000 being constantly in arrears. As a result, among other things, Plaintiff was forced to enter a receivables/factoring agreement to pay personnel that Plaintiff ultimately could not fulfill as a result of Defendants' other acts as set forth below.

17. As part of the same conspiracy, SM also directed Plaintiff to hand over Plaintiff's scheduling duties to Plaintiff's competitor, the Contract Superintendents. Again, Plaintiff was not aware—and was certainly not informed by Defendants, including its contractual counterparty SM—that the Contract Superintendents worked for Plaintiff's competitors. This directive was another violation of the Master Work Agreement, which provides that Plaintiff would have full control over its personnel with regard to Plaintiff's work for SM.

18. In or about late 2023, SM's CEO emailed all of SM's vendors, including Plaintiff, regarding SM's ethics policy, the steps to take to ask questions, and what constitutes violations of that policy. In response to this email, Plaintiff then reached out to SM regarding the delayed payments, that SM's superintendents were scheduling Plaintiff's personnel (contrary to the terms of the MWA), and that Plaintiff had recently learned that SM management had asked at least one of Plaintiff's employees about their ownership interest in Plaintiff.

19. Even after Plaintiff flagged this contact to SM, SM personnel asked at least one of Plaintiff's contractors to consider working for SM through one of Plaintiff's competitors. Plaintiff subsequently learned that this contractor copied versions of Plaintiff's reporting and QC templates and/or other proprietary material and took these misappropriated documents to Plaintiff's competitors, including Defendant Workrise. Plaintiff also later learned that other of Plaintiff's employees/contractors misappropriated Plaintiff's proprietary documents for use by Defendants. All of these actions were in reckless, knowing, and/or intentional violation of Plaintiff's confidentiality/proprietary information contracts with its personnel. In addition, SM personnel and the Contract Superintendents had been, with management's knowledge and/or direction, visiting SM worksites and encouraging Plaintiff's staff to work for one of Plaintiff's competitors.

20. On or about December 7, 2023, Plaintiff's CEO, Christopher Wood, attempted to contact SM management by phone regarding SM's 2024 workload projections for purposes of Plaintiff's insurance renewals. The renewal/lapse date for Plaintiff's insurance policy was December 20, 2023, a fact that was known to SM. After multiple attempts, Wood eventually was able to contact an SM representative, and SM informed Wood of the 2024 workload for Plaintiffs' services for SM. Plaintiff used that information to determine the total amount of insurance Plaintiff needed to procure, and thus the total premium paid, to appropriately insure Plaintiff's staff that

would be working on SM projects. By this time, Defendants knew they intended to ruin Plaintiff's business, making the premium payment a total or near total loss.

21. On December 15, following the advice of SM's HR department and the ethics email from SM's CEO, Wood spoke by phone with an SM engineer about SM's late payments and the Contract Superintendents, who Plaintiff finally knew were employed by Plaintiff's competitors, scheduling Plaintiff's personnel for SM work, and then not providing that schedule to Plaintiff.

22. On or about December 18, Wood met with SM management in person and again raised the foregoing issues. Wood's concerns were met with hostile and retaliatory misrepresentations from SM Management. Later that day, SM Management sent the following email to all of Plaintiff's personnel:

> **Subject:** Moving Forward With SM
>
> Team,
>
> Due to a business decision, SM Energy will be moving away from utilizing Rockstim as a consulting firm. Each one of you has been a key part to SM Energy's operational success within the completions team. Your hard work and dedication have made this organization successful. With that said, SM would like each one of you to continue working for our field operations. If you would also like to continue with SM it will be necessary to transition to a different firm within the next 90 days. The list below are approved consulting firms with SM:
>
> - Bedrock Petroleum Consultants LLC
> - Cielo Energy Consulting LLC
> - Decca Consulting
> - Rusco Operating LLC
> - RWDY Inc
> - SDS Petroleum Consultants LLC
>
> We are also actively working with 2 more consulting firms and more information sent out at a later date. Please inform your foreman and superintendents if you would like to continue with SM and change consulting firms.
>
> SM is always looking at evolving technology. In the next couple of months, we will be trialing peloton frac and others evolving technologies. You all will play a big part of this – no one is at risk and we would like to see everyone stay, grow and evolve with SM Energy.
>
> Please stay focused through these changes and holidays. Thank you for all your hard work! as always call me with any questions.
>
> Regards,
>
> **Nathan L. Moore** | Completions Manager
> **SM|ENERGY**

23. Shortly thereafter, SM added Defendant PPS as a "consulting firm" for which Rockstim's personnel could leave Rockstim and work. Plaintiff's personnel were then

6

systematically coerced to leave Plaintiff by one or more of Defendants SDS, Workrise/Rusco, or PPS (hereinafter, the "Consultant Defendants").

24. Within the 90-day deadline set by SM, almost all of Plaintiff's employees and contractors had left Plaintiff to work for Defendants SDS, Workrise, or PPS and continued to provide SM the same services that Rockstim had provided, but now through Rockstim's competitors. In so doing, most of those employees and contractors materially breached their contracts with Plaintiff, and Defendants knew it.

25. Without the personnel that were tortiously induced to leave Plaintiff, Plaintiff's business collapsed. Plaintiff not only lost all of its work with SM, but it also lost contracts and potential contracts with other companies that Plaintiff could not fulfill because Defendants left Plaintiff without the staff to provide services. In addition, Plaintiff defaulted on the receivables/factoring contract because of Defendants' actions.

## Misappropriation and Infringement

26. In conducting its business, Plaintiff compiled a proprietary electronic workbook for each job that contained hundreds, if not thousands, of calculations that allow the user to properly perform quality control, monitor jobs, and obtain a holistic picture of the treatments in order to determine the best approaches going forward. (the "Proprietary Workbook"). Rockstim expended thousands of hours in creating and refining the Proprietary Workbook since 2016. The Proprietary Workbook was created by Rockstim and emblazoned throughout with the Rockstim insignia:



Plaintiff included confidentiality provisions in its agreements with its personnel and took other measures to ensure that the Proprietary Workbook was not copied or misused by its competition, including limiting access to separate workbooks to particular jobs, and never transmitting the Excel version of the workbooks outside of the company. As proprietary work product, Rockstim also did not share the Proprietary Workbook with its customers, including SM. This Proprietary Workbook allowed Rockstim to save its customers millions of dollars over the years and was a competitive advantage for Rockstim in the industry.

27. When Defendants destroyed Plaintiff's business and misappropriated its personnel, they also coerced the former staff to share the Proprietary Workbook for the various jobs and then copied the workbooks to re-use for their own purposes, and without compensating Rockstim.

## IV.   CLAIMS

28. Each allegation in this complaint is incorporated by reference into each of the following claims.

**A.   Antitrust**

29. Defendants SDS, Hill, Workrise, and Rappatoni (the Contract Superintendents), participated in a conspiracy in restraint of trade or commerce in violation of Section 1 *et seq.* of the Sherman Act, Section 4 *et seq.* of the Clayton Act, and/or Texas Business and Commerce Code Section 15.05 *et seq.* by improperly withholding payment from Plaintiff in order to drive Plaintiff

out of business. Each had a conscious commitment to a common scheme to eliminate Plaintiff as a competitor, took actions to further that commitment, and thereby caused injury to Plaintiff. Such a horizontal cartel is illegal per se. In the alternative, such concerted action to suppress and destroy competition in the skilled engineering consulting and quality control services market in the oil and gas industry by Defendants-the largest market players. As a result of Defendants' concerted actions, competition in the aforementioned services to the oil and gas market was demonstrably restrained and/or otherwise deteriorated the quality (expertise, ethical, efficiency, etc.) of such services in the market. As a result of Defendants' actions, Plaintiff seeks actual damages, including before and after/yardstick or other method of calculating lost profits and attorneys' fees and costs. Because the conduct was willful or flagrant, Plaintiff seeks three-fold damages pursuant to Business and Commerce Code § 15.21(a).

30. In addition/the alternative, Defendants SDS, Workrise, and PPS engaged in a conspiracy in restraint of trade or commerce in violation of Section 1 *et seq* of the Sherman Act, Section 4 *et seq* of the Clayton Act, and/or Texas Business and Commerce Code Section 15.05 *et seq*. As alleged herein, Defendants conspired to coerce Plaintiff's staff to leave Plaintiff's employment in violation of such staff's agreements with Plaintiff, and otherwise took all of Plaintiff's staff in a 3-month period with the goal of eliminating Plaintiff as a competitor. Each of Defendants SDS, Workrise, and PPS had a conscious commitment to a common scheme to eliminate Plaintiff as a competitor, took actions to further that commitment (such as directly encouraging Plaintiff's staff to quit working for Plaintiff, and telling them that SM would not pay them if they continued working for Plaintiff and as otherwise set forth herein), and thereby caused injury to Plaintiff. Such a horizontal cartel is illegal *per se*, including but not limited to as an improper boycott, exclusive dealing agreement, etc. In the alternative, such concerted action to

suppress and destroy competition in the skilled engineering consulting and quality control services in the Texas oil fields by Defendants-the largest market players. As a result of Defendants' concerted actions, competition in the aforementioned services to the oil and gas market was demonstrably restrained (including depriving the choices of other non-SM companies in the market for services) and/or otherwise deteriorating the quality (expertise, ethical, efficiency, etc.) of such services in the market. As a result of Defendants' actions, Plaintiff seeks actual damages, including before and after/yardstick or other method of calculating lost profits and attorneys' fees and costs. As a result of Defendants' violation of the Sherman/Clayton Acts, Plaintiff is entitled to treble damages pursuant to Section 4 of the Clayton Act. In the alternative, because the conduct was willful or flagrant, Plaintiff seeks three-fold damages pursuant to Business and Commerce Code § 15.21(a). Plaintiff also seeks pre- and post-judgment interest.

31. In addition, as set forth in more detail below, prior to the misappropriation of the Proprietary Workbooks for the various jobs, SDS and Workrise did not have a competent field engineering footprint, which makes their tactics, of which Rockstim is just one victim, even more damaging to innovation and competition in the market.

32. As required by § 15.21(c) of the Texas Business and Commerce Code, a copy of this complaint has been mailed to the Attorney General of the State of Texas.

**B.     Misappropriation of Trade Secrets under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, et seq., and the Texas Uniform Trade Secret Act, Tex. Civ. Prac. & Rem. Code § 134A.003, *et seq.***

33. As set forth above, for each job, Rockstim created a Proprietary Workbook in to properly perform quality control, monitor jobs, and obtain a holistic picture of the treatments in order to determine the best approaches going forward. (the "Proprietary Workbook"). Rockstim combined the technical information it gathered from the treatments with hundreds and even

thousands of technical calculations in the workbooks in order to gain a competitive advantage and save its customers millions of dollars.

34. Rockstim kept this information confidential through multiple means and was not provided to competitors or even customers, such as SM. Rockstim also required all of its employees to agree to confidentiality provisions in their contracts and took other reasonable measures to ensure the confidentiality of the Proprietary Workbooks.

35. After Defendants conspired to destroy Rockstim and misappropriate its staff, Defendants used the Proprietary Workbook to continue the projects that had been previously performed by Rockstim and its staff. For instance, with SDS's knowledge and assistance, Ruben Ruiz, formerly of Rockstim, misappropriated the Proprietary Workbook for his subsequent work with SDS. Similarly, SM, under the direction of Regina Choate, ordered Felix Cantu, formerly of Rockstim, to misappropriate the Proprietary Workbook on the job after leaving Rockstim. Similarly, for each of the other jobs usurped by the coordinated action of Defendants from Rockstim, Defendants misappropriated Rockstim's Proprietary Workbook to seamlessly continue the exact same work that Rockstim had been undertaking. Prior to this misappropriation, SDS and Workrise did not have a competent field engineering footprint, which makes their tactics, of which Rockstim is just one victim, even more damaging to innovation and competition in the market.

36. Defendants have misappropriated Rockstim's trade secrets by engaging in unauthorized use of its trade secrets to provide Defendants with an unfair advantage and to improperly compete with Rockstim.

37. Defendants' misappropriation was willful and malicious because each knew of the former Rockstim's personnel's post-employment covenants and of the trade secret nature of the

Proprietary Workbooks, but they misappropriated them anyway. Defendants then copied the Proprietary Workbooks in an attempt to hide their known misappropriation.

38. Plaintiff is entitled to monetary damages to recover its actual loss (lost profits) caused by Defendants' misappropriation and/or to recover for the Defendants' unjust enrichment. In the alternative, Plaintiff seeks reasonable royalty. In addition to these actual damages, Plaintiffs seek pre- and post-judgment interest, exemplary damages (double), and attorneys' fees because Defendants' misappropriation was willful and malicious.

### C. Tortious Interference with Contractual Relations (against all Defendants, regarding Plaintiff's Employment/Independent Contractor Contracts)

39. Plaintiff had valid contracts with its employees and contractors (the "Employment Contracts"). Each such Employment Contract contained provisions prohibiting its employees and contractors from sharing proprietary information and/or working for a competitor and/or requiring notice and a waiting period. No Defendant was party to any of the Employment Contracts.

40. Each Defendant either knew of the Employment Contracts or had knowledge of facts and circumstances that would lead each Defendant to believe that a contractual relationship existed between Plaintiff and each of Plaintiff's employees and contractors.

41. Defendants' tortious interference with the Employment Agreements proximately caused Plaintiff damages, including but not limited to the damages/injuries as set forth above and/or the benefits Plaintiff would have received from the Employment Contracts absent Defendants' tortious interference, the complete loss of Plaintiff's business, misuse/misappropriation of Plaintiff's proprietary information, and/or Plaintiff's lost profits.

42. As set forth above, each Defendant willfully and intentionally interfered with Plaintiff's contracts with its personnel, entitling Plaintiff to exemplary damages.

**D.	Tortious Interference with Contractual Relations (against Defendants SDS, Workrise, and PPS, regarding Plaintiff's Master Work Agreement with SM)**

43.	Each of Defendants SDS, Workrise, and PPS either knew of the Master Work Agreement between Plaintiff and SM or had knowledge of facts and circumstances that would lead each Defendant to believe that such a contractual relationship existed (*e.g.*, each such Defendant has the same or a similar agreement with SM).

44.	Defendants SDS, Workrise, and PPS each willfully and intentionally interfered with Plaintiff's Master Work Agreement with SM. Each of these Defendants communicated to Plaintiff's personnel that those personnel would not be paid for SM work going forward unless they quit working for Plaintiff and instead worked for Defendant SDS, Workrise, or PPS, thereby interfering with Plaintiff's ability to fulfill its obligations under its Master Work Agreement with SM. In addition, Plaintiff was owed compensation for moneys for work completed by SM, but the Consulting Defendants, upon reason and belief, usurped those funds.

45.	In addition, and as alleged, employees of Defendants SDS and Workrise interfered with Plaintiff's ability to receive compensation for its services under the Master Work Agreement with SM.

46.	These Defendants' tortious interference with Plaintiff's Master Work Agreement with SM proximately caused Plaintiff damages, including but not limited to the damages/injuries as set forth above and/or the benefits Plaintiff was owed under the Master Work Agreement absent these Defendants' tortious interference, as well as Plaintiff's lost profits, and Plaintiff is also entitled to exemplary damages.

**E.     Tortious Interference with Prospective Business Relationships (against all Defendants)**

47.     There was a reasonable probability that Plaintiff would have entered into a business relationship with certain companies had Defendants not caused all of Plaintiff's staff to leave Plaintiff's employ.

48.     Defendants knew their wrongful actions would result in Plaintiff's inability to provide services for not only Defendant SM, but for any other company.

49.     As alleged herein, Defendants' conduct was independently tortious or unlawful. Defendants' unlawful interference resulted in Plaintiff being unable to obtain contracts and revenue from these prospective relationships, thereby proximately causing Plaintiff injury, and Plaintiff suffered losses as a result in an amount to be proved at trial.

**F.     Fraud**

50.     Defendants SDS, Rappattoni, and Workrise (the Contract Superintendents), SM, and Moore are liable to Plaintiff for fraud by misrepresentation and/or by non-disclosure with respect to the actions surrounding the Contract Superintendents as alleged above and otherwise. In order to defraud Plaintiff of moneys owed for work performed, these Defendants made materially false representations and/or partial disclosures to Plaintiff, and/or they also failed to disclose known falsities to Plaintiff in order to correct a false impression and/or to otherwise correct a previous fraudulent or misleading statement. Defendants made these representations (and/or failures to disclose) knowingly, intentionally, or recklessly with the intent that Plaintiff act upon them, and Plaintiff relied on such representations to her detriment. Plaintiffs seek actual and exemplary damages for Defendants' fraudulent actions/non-disclosures.

14

**G.      Negligence/Negligent Misrepresentations**

51.     Each of the Defendants, SDS, Rappattoni, and Workrise (the Contract Superintendents), SM, and Moore is liable to Plaintiff for negligence/negligent misrepresentation with respect to the actions of the Contract Superintendents as alleged above.. Defendants owed Plaintiff a duty to exercise a level of skill and care in regard to responding to inquiries and providing required disclosures and/or certificates to Plaintiff. Defendants breached their duty to Plaintiff by failing to exercise reasonable care and skill in the performance of their duties, and/or Defendants did not exercise reasonable care or competence in obtaining or communicating information provided to Plaintiff. Defendants' breach of their duty of care was a proximate cause of Plaintiff's injuries and damages, and/or Plaintiff relied upon Defendant's representations and as a result of said reliance. Plaintiff suffered damages in an amount to be determined at trial.

52.     The foregoing acts/omissions of Defendants constitute gross negligence because they involved extreme risk in lieu of the probability and magnitude of damages to Plaintiff and/or others, and Defendants were aware of the risk but proceeded with their acts/omissions with conscious indifference to the safety and/or welfare of Plaintiff and/or others. Accordingly, Plaintiff seeks the maximum damages permitted under the Texas Damages Act, equaling additional exemplary damages of twice the actual damages amount.

**H.      Breach of Contract (against SM Energy)**

53.     The MWA between SM and Plaintiff is a valid contract. As alleged herein, SM materially breached the MWA, thereby proximately causing Plaintiff injury and damages in an amount to be determined at trial. All conditions precedent have been satisfied or waived.

**I.      Money Had and Received (Against Defendants SDS, Workrise, and PPS)**

54. Each of these Defendants holds money (received from SM) that belongs to the Plaintiff in equity and good conscience.

55. Specifically, (i) the money received for work performed by Plaintiff and (ii) the money that each Defendant received from SM for work performed by one of Plaintiff's former personnel members who left Plaintiff's employ due to the wrongful acts of Defendants alleged herein belong, less the money that each Defendant paid such individuals for that work, belongs in equity and good conscience to Plaintiff.

### J. Vicarious Liability

56. All Defendants, in combination with each other, agreed to, assisted and encouraged, and/or assisted and participated, for an unlawful purpose or by unlawful means to damage and/or otherwise harm Plaintiff. The Defendants knew the agreed acts would result in harm to Plaintiff. The object of the conspiracy/participation was to usurp Plaintiff's personnel. Defendants carried out the foregoing acts, which proximately caused injury to Plaintiff.

57. In the alternative, Defendants committed one or more torts as set forth above. Each of the other Defendants had knowledge that those actions constituted a tort, and each of the other Defendants had the intent to assist in committing the tort. Each of the Defendants gave assistance or encouragement, and each of the Defendants' assistance or encouragement was a substantial factor in causing the tort.

58. Each of the employees/contractors working for SDS, Workrise, or PPS was acting within the scope of their authority of their agency when they committed the foregoing torts; accordingly, each of SDS, Workrise, or PPS is responsible for the acts of their agents. In the alternative, Plaintiff was injured by a tort of each of the employees/contractors working for SDS, Workrise, or PPS, who each were working within the scope of their authority to further the business

of his principal at the time. Accordingly, SDS, Workrise, or PPS is responsible for the acts of their agents.

59. Plaintiff suffered injury as a proximate result of Defendants' actions, and Defendants should be held jointly and severally liable for such injury.

**K.  Attorney's Fees**

60. In addition/the alternative to the reasons set forth under each cause of action, Plaintiff is entitled to recover reasonable and necessary attorneys' fees, expert fees, and costs from Defendants as a prevailing party under the respective contracts and/or pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code and/or Texas Business and Commerce Code Section 15.21 *et seq.*, 134A.003, *et seq.*; pursuant to the Sherman/Clayton Acts; and/or 18 U.S.C. §§ 1836, *et seq*. Plaintiff is represented by an attorney, and Plaintiff has incurred reasonable and necessary attorneys' fees in this case in pursuit of justice for Defendants' wrongful acts and will continue to incur reasonable and necessary attorneys' fees until this matter is resolved.

**L.  Conditions Precedent**

61. All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

**M.  Jury Demand**

62. Plaintiff hereby respectfully demands a jury trial in this cause and herewith pays the required jury fee.

**PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED Plaintiff prays that the court issue Summons for Defendants to appear and answer, and upon final consideration hereof, it have and recover of and from the Defendants its damages, multiple damages, exemplary damages, double or treble

damages, attorney's fees, expert fees, costs, and such other relief requested herein, pre- and post-judgment interest, costs of court, and for such other and further relief, both general and special, at law and in equity, to which Plaintiff may be justly entitled.

        Respectfully submitted,

        */s/Jacob Scheick*
        Jacob Scheick
        PilotHouse Litigation, PLLC
        jacob@pilothouselitigation.com
        State Bar No. 24060563
        3805 Red River, # 120
        Austin, Texas 78751
        (512) 507-4097
        **ATTORNEYS FOR PLAINTIFF**